**COMMONWEALTH of Kentucky, REVENUE CABINET, Appellant,**

v.

**SOUTH HOPKINS COAL COMPANY, Appellee.**

Court of Appeals of Kentucky.

March 13, 1987.

Rehearing Denied May 22, 1987.

Discretionary Review Denied by Supreme Court Aug. 26, 1987.

John C. Tobin, Revenue Cabinet, Frankfort, for appellant.

Jesse T. Mountjoy, Timothy O. Shelburne, Holbrook, Cary, Wible & Sullivan, P.S.C., Owensboro, for appellee.

Before LESTER and GUDGEL, JJ., and DUNN, Special Judge.

DUNN, Special Judge.

The Revenue Cabinet appeals from that part of the judgment of the Hopkins Circuit Court reversing the decision of the Kentucky Board of Tax Appeals which had affirmed the cabinet in subjecting to the coal severance tax the Tennessee Valley Authority's $1,765,048 lump sum payment to the appellee, South Hopkins Coal Company, which the company had excluded from its computation of the gross value of its coal sold to TVA. We affirm.

The ability to appeal or to seek judicial review from a decision of an administrative board is not one of right. When it is conferred by statute strict compliance with the statute's terms is required. *Pickhart v. U.S. Post Office,* Ky.App., 664 S.W.2d 939 (1983).

KRS 131.370 provides for a circuit court judicial review of orders, decisions or determinations of the Kentucky Board of Tax Appeals. In pertinent part referring to circuit courts, it states that:

(3) The court ... shall dispose of the cause in a summary manner, its review being limited to determining whether or not:

(a) The board acted without or in excess of its powers;

(b) The order, decision, or award was procured by fraud;

(c) The order, decision, or award is not in conformity to the law; and

(d) If findings of fact are in issue, whether such findings of fact support the order, decision or award.

The taxes in question concern the company's coal severance taxes for the "audit period" January 1, 1979, through December 31, 1982. It primarily extracts, processes, transports and markets coal to various customers, primarily the Tennessee Valley Authority.

In 1973 it and TVA executed a coal sales contract for the supply and sale of coal by the company to TVA. The company was obligated to deliver to TVA 20,000 tons of coal per week at a base price of $7.00 per ton through November 5, 1981. The delivery was secured by a $391,500 performance bond. The contract also included a "gross inequities clause" which the company had invoked resulting, effective February 1976, in increasing the per ton price from $7.00 to $11.52, including a 4% severance tax, and to extend the term during which the coal was to be delivered from November 5, 1981 to January 21, 1984.

By 1980 the company had become the lowest priced long-term supplier of coal to TVA. In November, 1980, it notified TVA that it was again invoking the "gross inequities clause" which would require cancella-tion of the contract unless it received a price increase.

After negotiations, "Supplement 75", a supplemental agreement to the original amended contract between the parties, was executed April 30, 1981. It provided that: 1) after March 1, 1981, the company was to sell at the existing $11.52 per ton rate and deliver to TVA 3,300,000 tons of coal from its existing reserves and from additional reserves provided for in the supplement; 2) TVA was to pay to the company a lump sum payment of $1,765,048 which the company agreed to pay as advance royalties in acquiring 1,838,592 tons of additional coal reserves from Island Creek Coal Company located adjacent to the company's existing reserves; and, 3) in addition to the lump sum payment and in addition also to the $11.52 price per ton provided in the amended contract, TVA agreed to pay 96¢ per ton for all coal in excess of 1,838,592 tons acquired from the above additional reserves. The company also was to deliver to TVA, as beneficiary to guarantee the company's performance of the amended contract as supplemented, an irrevocable bank letter of credit in the same amount of the lump sum payment, $1,765,048, in substitution for the $391,500 performance bond provided for in the original amended contract. In this regard the amount of liability under the letter of credit was to be reduced annually from March 1, 1981, at the rate of 53¢ per ton of coal delivered by the company to TVA from and after that date, but not to be reduced below $391,000 until the amended contract as supplemented was fully performed. The supplement also provided that the "gross inequities clause" of the 1973 contract as amended in 1976 was cancelled and of no further effect.

In effect "Supplement 75" obligated the company to supply coal to TVA to an increased total of 3,300,000 tons and extended the term during which the coal was to be delivered by such additional time as would be necessary for the company to fulfill the new tonnage obligations at the price existing under the original amended contract until 1,838,592 tons from the addi-

tional reserves were delivered to TVA when an increase of 96¢ per ton would be effective.

The company acquired the additional reserves for which the $1,765,048 was advanced by TVA by paying it to Charles Savidge, its president and chief executive officer, who in turn purchased the adjacent additional reserves from the Island Creek Coal Company. Savidge in turn leased those reserves to the company for the $1,765,048 amount prepaid to him plus a 10% royalty on all coal mined in the additional reserves in excess of 1,838,592 tons. It is estimated that these reserves contained 1,300,000 tons over and above the approximately 1,838,592 tons for which advanced royalty had already been paid, resulting in an obvious gain to Savidge on the excess.

The company in accordance with the agreement provided TVA as security for its extended coal supply obligation an irrevocable bank letter of credit for $1,765,048. For bookkeeping purposes a $1,765,048 debit was entered on the company's books for the cost of the lease on the additional approximate 1,838,592 tons of coal it was to supply from the additional reserves. This asset account was credited on a basis of 96¢ per delivered ton of coal from the additional reserves to amortize the $1,765,048 cost of the additional reserves. A $1,765,048 credit entry was entered to reflect the company's tonnage obligation to TVA secured by the letter of credit. This account was debited at a rate of 53¢ per ton delivered from and after March 1, 1981.

Although the company included the $1,765,048 lump sum payment from TVA in its gross income, it excluded it from "gross value" under KRS 143.010(6) when it filed its severance tax return for the audit period in question. The company takes the position that the lump sum payment was not an amount received for coal supplied to TVA during the audit period and accordingly was excludable from gross value under KRS 143.010(6)(a) in computing the coal severance tax. The cabinet takes the position that the full amount of the lump sum

payment should have been included in the "gross value" and thus should not have been excluded under KRS 143.010(6)(a) in computing the coal severance tax.

The cabinet in a simplification of its position argues that the only commodity the company has to sell to TVA is coal and that any money received by it from TVA during the audit period is in payment of the purchase of coal whether it be for current payment or whether it be as prepayment for coal severed during the audit period and that it should be subject to severance tax.

This argument ignores the proof that "Supplement 75" had its genesis in the company requesting relief from the existing amended contract under its "gross inequities clause" because it was operating at too low a profit margin. The supplement by its terms did not provide for any price increase for the coal sold and delivered during the audit period in question. Nowhere in the supplement is the lump sum payment characterized as being a price increase for coal. Even if the company would not have entered into the extended coal supply supplement without the lump sum payment being made, this does not establish that it is payment received as a price increase for coal. To the contrary, the proof establishes several unrefuted valid business reasons for the company foregoing a price increase which is not the only means by which its profit margin could be increased. As a result of the execution of the supplement the company received an extended, long-term coal sales contract with its largest customer and it also received a long-term coal lease on additional reserves which were adjacent and contiguous to the present mine. These reserves could be accessed without the necessity of moving equipment or making any new opening. As a result of its costs remaining constant, its profit margin would increase with increased production without the expenses of relocating to another mine.

On the other hand, the cabinet's position is one of engaging in a numbers game [1]

1. The numbers are: the company received a $1,765,048 lump sum payment and a 96¢ per ton

and bottoms its above-stated simplified position upon the inferences which might be drawn by the naked application of the numbers involved. However, these inferences, though mathematically correct, are not reasonably sufficient to support the factual conclusion the cabinet draws from them in contrast to the plain, clear, unequivocal terms of the written "Supplement 75."

We are concerned with the issue of "substantial evidence." To support a reasonable inference, there must be sufficient proof to tilt the balance from possibility to probability. *Huffman v. S.S. Mary & Elizabeth Hospital*, Ky., 475 S.W.2d 631 (1972). The numbers game the cabinet uses creates a possibility to support its and the board's findings and conclusions that the lump sum payment was for coal alone as do the debit and credit bookkeeping entries. However, these mere possibilities are not "substantial evidence" sufficient to support its and the board's determination. "Substantial evidence" is not simply some evidence or even a great deal of evidence; rather, substantiality of evidence should take into account whatever fairly detracts from its weight. *Pierce v. Kentucky Galvanizing Co.*, Ky.App., 606 S.W.2d 165 (1980). The mere possibilities promulgated by the cabinet do not fairly detract from the weight of the written terms of the contracts with which we are concerned. The legally binding contracts in question are direct evidence that no price increase during the audit period was received on coal sales to TVA. The coal it received during the audit period was sold for the same price per ton as existed prior to the 1981 supplemental contract and severance taxes were paid by the company on this amount.

Additionally, as a result of the negotiations leading up to the execution of "Supplement 75", both the company and TVA received benefits and suffered detriments. The $1,765,048 lump sum payment was one of such benefits and detriments. It was in reality for two benefits to TVA: 1) assurance of an adequate supply of coal reserves in the future available to it at the existing low price; and, 2) the elimination of the "gross inequities clause" from its long-term contract with all of the uncertainties inherent in it. All of these factors are supported by substantial evidence.

On the other hand, however, as we have already stated, there is no evidence that the transfer of coal at an increased price was one of the results of the supplemental contract and that the total lump sum payment was for coal. This proposition has not been proven since it would totally ignore the proven facts established in the written documents in evidence that there were benefits and detriments of significant value flowing to each of the parties justifying a non-increase in the price of the sale of coal. The cabinet's position allows no value at all to them.

It is our obligation under the standard of review we are permitted to apply to administrative board decisions to determine whether or not the trial court's decision in reversing the Board of Tax Appeals' decision is founded on the fact that the Board's decision was not supported by substantial evidence to support it or that it was not in conformity to the law, or both.

As already indicated we agree with the trial court that the evidence before the Board of Tax Appeals was not sufficient to support its finding that the payment of $1,765,048 by TVA to the company was for coal severed during the audit period. In view of total absence, except inferentially, of any proof before the board of any terms of the agreement that would indicate the payment of that sum was for coal severed during the audit period at a price per ton in excess of the amount set in the amended 1973 agreement, we must conclude that the lump sum payment was for the other benefits inuring to TVA from the 1983 supplemental agreement.

---

price increase after the first 1,838,000 tons were delivered. 96¢ per ton x 1,838,000 tons equal $1,765,508, almost exactly the amount of the lump sum payment. Cabinet concludes the lump sum payment was a ploy disguising the

lump sum payment as a negotiation incentive when in reality it was prepayment of the eventual 96¢ per ton increase as applied to the first 1,838,000 tons delivered from the additional reserves.

Even if the lump sum payment was characterized as prepayment for coal, it is not subject to severance taxes as there is only liability under KRS 143.010(6) on payment received from "(b) ... coal severed and/or processed" during the reported period was in fact included in its selling price by the company in its payment of the severance tax.

Consequently, we AFFIRM that part of the Hopkins Circuit Court reversing the decision of the Kentucky Board of Tax Appeals which affirmed the Revenue Cabinet subjecting to severance tax the $1,765,048 lump sum payment by TVA to the South Hopkins Coal Co.

All concur.